IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

IN THE MATTER OF THE SEARCH OF
RESIDENCE LOCATED AT 3419
KERSHAW ROAD, IN ROANOKE,          Case No. ___7:22mj123_____
WTIHIN THE WESTERN DISTRICT OF
VIRGINIA, INCLUDING VEHICLES       **Filed Under Seal**
ASSOCIATED WITH SUCH RESIDENCE

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Andrew Burton, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.       I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and

Explosives ("ATF") and have worked in this capacity since March of 2020. I am a graduate of

Virginia Commonwealth University, with a Bachelor of Science Degree in Criminal Justice, as

well as the Federal Law Enforcement Training Center (FLETC) and the ATF Special Agent

Basic Training Academy. I am currently assigned to the Roanoke Field Office, Washington Field

Division. Prior to my employment with the ATF, I was employed as a Secret Service Uniformed

Division Officer for 5 years. As an ATF Special Agent, I have received specialized training in

various aspects of criminal law enforcement relating to arson, explosives, narcotics and firearms

investigations.  As a duly sworn Federal law enforcement agent, I am authorized to carry

firearms, execute warrants, and make arrests for offenses against the United States and to

perform such other duties as authorized by law.  I am familiar with Federal criminal laws

pertaining to narcotics offenses under Title 21 of the United States Code and firearms offenses

under Titles 18 and 26 of the United States Code. As a result of my training and experience, I

have learned methods commonly used by narcotics and firearms traffickers to engage in

unlawful activity. I am familiar with evidence that is frequently indicative of narcotics trafficking, unlawful firearms possession and firearms trafficking.

      2.      The facts in this affidavit come from my training and experience as well as information obtained from other law enforcement officers and interviews with witnesses. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE PROPERTY TO BE SEARCHED

      3.      This affidavit is submitted in support of a warrant to authorize the search of the residence located at 3419 Kershaw Rd. NW, Roanoke, VA 24017 in the Western District of Virginia, as more particularly described in Attachment A, which may constitute or contain records, fruits, instrumentalities and evidence of violations of Title 21, United States Code (U.S.C.), Section 841(a) – distribution of controlled substances and Title 18 U.S.C., Section 922(g)(1) – felon in possession of a firearm, Section 933 – Trafficking in firearms and Section 924(c) – possession of a firearm in furtherance of a drug trafficking crime.

      4.      The applied-for warrant would authorize the search of this property for the purpose of identifying evidence, fruits, and instrumentalities of violations of the federal narcotics and firearms laws, as described more particularly described in Attachment B.

## PROBABLE CAUSE

### CASE INITIATION

      5.      The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) is engaged in an ongoing criminal investigation of Alishia Nicole WARRICK regarding possible violations of Title 21, U.S.C., Sections 841(a)(1), Title 18 U.S.C., Section 922(g)(1), Section 933 and Section 924(c) relating to the distribution of controlled substances and firearms. WARRICK has

previously been convicted of felony possession of schedule I or II controlled substances and is prohibited from possessing firearms.

6.      Between October 2022 and December 2022, investigators made several controlled purchases of reported heroin from WARRICK within the Western District of Virginia, using a confidential informant (CI). The affiant knows the CI has been previously convicted of a felony offense and has worked with other law enforcement departments in a similar capacity. The affiant has spoken with these departments and confirmed the reliability of the CI's information. Standard controls were in place for all transactions, to include the use of audio and video recording devices, pre-recorded currency, searches of the CI before and after each transaction, and active police surveillance techniques. All the controlled purchases were conducted less than 2 miles from WARRICK's residence. Investigators confirmed WARRICK's identity by DMV photo comparison to the covert surveillance video footage. Investigators further confirmed WARRICK's identity based on her tattoo on her right hand which appears in the video footage and has been previously documented by law enforcement. Photographs used in this comparison are on the following page.

**Left photograph is a Roanoke City Jail Booking photo showing WARRICK's right hand tattoo. The right photo is a screenshot from covert surveillance footage showing the same tattoo on WARRICK's right hand.**



7.      WARRICK has been identified through DMV records as living at 3419 Kershaw Rd. NW, Roanoke, VA 24017. Also, law enforcement databases indicate that WARRICK has lived there since approximately 2019 with her boyfriend, an individual known as Terrell BRADBURN. According to these reports both individuals were known to deal narcotics out of the residence. Throughout the investigation the CI has been in contact with WARRICK using phone number (540) 355-0433. According to AT&T the subscriber is Terrell BRADBURN of 3419 Kershaw Rd. NW, Roanoke, VA 24017 and has a contact email address of Alishiawarrick@gmail.com. On more than one occasion WARRICK has been driven to the transactions by an unidentified black male.

8.      Investigators made a controlled purchase of approximately 4 grams of reported heroin from WARRICK in mid-October 2022, using the CI. The CI made a recorded call to

WARRICK, under police observation to arrange the deal. WARRICK stated that she was unable

to procure methamphetamine but represented that she had heroin for sale. WARRICK agreed to

sell the CI a "seven", which is slang for a quarter ounce or approximately 7 grams, for $325.

Next the CI asked how long it would take WARRICK to get to the meet location and WARRICK

stated 3-4 minutes. After the CI arrived at the meet location, they spoke with WARRICK again

via phone in which WARRICK told the CI that she could not bring the full quarter ounce

because she had just sold a piece of it. Shortly after the call investigators conducting surveillance

at WARRICK's residence witnessed a Buick Encore, black in color, bearing VA license plate

TUR-2102 arrive. A black female matching WARRICK's description came from the residence

and got into the Buick. Shortly thereafter the Buick arrived at the meet location and WARRICK

is on video selling approximately 4 grams of reported heroin to the CI. Following the transaction,

the CI relinquished the narcotics and confirmed WARRICK was the seller after being shown a

DMV photo.

9.      Investigators made another controlled purchase of approximately 12 grams of

suspected heroin from WARRICK in late-October 2022, using the CI. The CI made another

recorded phone call to WARRICK, under police observation to arrange the deal. WARRICK told

the CI that she was at the mall but could meet the CI at the meet location in 15-20 minutes.

Shortly after the recorded call investigators conducting surveillance outside WARRICK's

residence witnessed the Buick Encore VA bearing license plate TUR-2102 arrive at the

residence. WARRICK exited the vehicle, checked her mailbox, then she jogged into the house

and reappeared a few minutes later from the home. The vehicle then proceeded to the meet

location at which WARRICK was seen getting into the CI's vehicle to complete the sale. During

this controlled purchase the CI inquired about purchasing firearms from WARRICK to which

WARRICK responded, "I got you". During the debrief the CI confirmed they purchased from WARRICK, relinquished the narcotics, and stated that WARRICK was willing to sell them guns.

10.     Following these two controlled purchases the CI contacted WARRICK to arrange the firearm deal. Using number (540) 355-0433 WARRICK texted the pictures on the following page of two different Glock pistols to the CI.

**Photograph #1 and 2 shows a Glock, Model 19, 9mm, Semi-Automatic Pistol.**



Photograph #2



**Photograph # 3 and 4 shows a Glock Model 20, 10mm, Semi-Automatic Pistol,**

**bearing SN: BPMT980**



Photograph # 4



11.    In early November 2022, investigators made another controlled purchase of 29.6 grams of suspected heroin from WARRICK, using the CI. The CI made another recorded phone call to WARRICK, under police observation to arrange the deal. During the call WARRICK agreed to sell an ounce of reported heroin and both pistols. During the transaction the CI physically counted out $500 for one pistol $750 for another totaling $1250 for the two Glock pistols and $1300 for the reported heroin. In total the CI handed WARRICK $2550 in pre-recorded government funds. WARRICK was seen leaving the transaction driving a Mercedes GLA250, silver in color, bearing VA license plate UHH-7202. WARRICK is seen on video handling both pistol cases, which contained the pistols, and the reported narcotics. During the debrief the CI relinquished the pistols and the narcotics to investigators.

12.    In mid-December 2022, investigators made another controlled purchase of 37.1 grams of reported heroin from WARRICK, using the CI. The CI made several recorded phone calls to WARRICK, under police observation to arrange the deal. During these phone calls WARRICK stated that she was tied up at work but suggested getting her brother and daughter to complete the deal at her residence. Investigators conducting surveillance at WARRICK's residence witnessed a 4-door sedan pull into the driveway and a female wearing red pants go into the residence. Shortly after the female wearing red pants reappeared from the residence and left in the 4-door sedan bearing VA tag UUM6160. A few minutes later this vehicle arrived at the meet location and WARRICK completed the transaction inside the CI vehicle. WARRICK left in the Hyundai Sonata and Investigators witnessed it return to the residence shortly thereafter.

**Photograph #5 is a screenshot from car surveillance of WARRICK holding the narcotics during one of the transactions.**



13.     Three of the four quantities have been analyzed by the DEA Mid-Atlantic Laboratory and the substances have contained a mixture including fentanyl.

14.     Following the purchase of the two Glock pistols investigators initiated a trace of the firearms to determine the original purchasers. Of note the Glock Model 19 was originally purchased on May 21, 2022, by Demarco Christopher JACKSON. Investigators found that JACKSON had been arrested for first degree murder and use of a firearm in connection with the murder of a 15-year-old male in Roanoke, VA on September 04, 2022. Investigators conducted a

comparison of the shell casings recovered from the scene and determined that the Glock, Model 19, WARRICK sold the CI was one of the firearms shot at the murder scene.

## TECHNICAL TERMS

15.     Based on my training and experience, and participation in this and other firearm and drug trafficking investigations, I know that:

      a.  Drug traffickers often keep ledger books, telephone books, receipts, drug customer lists, photographs and other papers that identify co-conspirators, pertinent locations or residences and other information relating to the importation, transportation, purchasing, distribution of controlled substances and related proceeds, and that such information is often maintained in residences, storage facilities, or places of business to which the drug trafficker has ready access;

      b.  Drug traffickers generate substantial profits as a result of drug dealing, most often in the form of cash.  While they may deposit such assets in financial institutions at times, they more frequently maintain stashes of currency in various places to avoid detection by law enforcement agencies and to safeguard against robbery.  For similar reasons, drug traffickers may keep portions of their financial assets separate from the narcotics they sell.  These tools of the trade – cash, drugs, firearms, and equipment to include phones and electronic devices, are less vulnerable to seizure by law enforcement if maintained in separate and closely held locations the drug trafficker controls or to which he/she has ready access.  Such assets may be placed into the names of other individuals or stored at residences and facilities controlled by drug associates;

c.  Drug traffickers commonly "front" (i.e. provide on consignment) controlled substances to their clients and the aforementioned books, records, receipts, notes, ledgers, etc. are maintained where the drug traffickers have ready access to them. It is common practice for large scale drug dealers to secrete contraband, proceeds and drug sales and records of drug transactions in secure locations within their residences, stash houses, and/or places of business for ready access and to conceal such items from law enforcement authorities.  Persons involved in large scale drug trafficking often conceal in their residences, stash houses, and/or places of business, caches of drugs, large amounts of currency, financial instruments, precious metals, jewelry, automobile titles and other items of value which are proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting or spending large sums of money acquired from engaging in drug trafficking activities;

d.  When drug traffickers amass large proceeds from the sale of drugs, they often attempt to legitimize or "launder" these profits.  To accomplish this, drug traffickers may purchase assets such as vehicles, utilizing the services of domestic and foreign banks and/or financial institutions;

e.  Drug traffickers commonly cause to be taken photographs of themselves, their associates, their property and items used in the distribution of controlled substances. These traffickers usually maintain these photographs in personal electronic devices, at their residences, storage facilities, or places business to which they have ready access;

f.  It is common for drug traffickers to hide drugs, proceeds of drug transactions and records of drug sales in secure locations to which they have ready access, including residences of relatives and associates to which they have access or over which they maintain dominion and control, with the aim of concealing these items from law enforcement.  At these locations, drug traffickers often use safes, surreptitious compartments, money counting machines, and other secure storage devices to count and store the profits of their drug business.

g.  Drug traffickers commonly possess and use firearms to further the drug enterprise as a form of currency to be exchanged for drugs, and/or as an item of investment, intimidation, and/or for protection from robberies by other traffickers or customers;

h.  Individuals engaged in drug trafficking often maintain paraphernalia for cutting, weighing, packaging, manufacturing, and distributing controlled substances at locations to which they have ready access;

i.  Individuals involved in the unlawful distribution of controlled substances often use computer equipment, phones and similar devices to document and track their business affairs; and

j.  Drug trafficking tends to be a continuing activity over months and even years.  Drug traffickers will repeatedly obtain or manufacture and then distribute drugs on a repetitive basis, maintaining a drug inventory that fluctuates in size depending on demand and available supply. Traffickers often keep records of their illegal activities in electronic or hard copy format for months or years beyond the time during which they actually possess illegal drugs, in order to maintain contact with their criminal co-conspirators and associates for future transactions.

## CONCLUSION

16.     Based on the foregoing, I submit that this affidavit supports probable cause for a search warrant authorizing the search of property described in Attachment A to seek and seize the items and evidence described in Attachment B. I further submit, based on the potential safety risks posed by that good cause exists to execute this warrant at any time of the day or night, as determined by law enforcement officers trained to recognize when execution of such warrant is least likely to pose safety risks to occupants of the residence, to officers engaged in the operation, and to members of the general public.

Respectfully submitted,

Andrew Burton
Special Agent (ATF)

Subscribed and sworn to before me on December 19, 2022

Robert S. Ballou

The Honorable Robert S. Ballou
United States Magistrate Judge